# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA RODIN,<br><br>         Plaintiff,<br><br>     v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>         Defendant. | Case No. 1:21-cv-00900-SAB<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 27, 30, 33) |

## I.

## INTRODUCTION

Monica Rodin ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' cross-motions for summary judgment, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]  Plaintiff requests the decision of Commissioner be vacated and the case be remanded for the award of benefits or further proceedings, arguing the Administrative Law Judge's 1) rejection of the State Agency physicians' handling limitations was not supported by substantial evidence; and (2) the ALJ's rejection of Dr. Khanna's opinion was not

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been assigned to Magistrate Judge Stanley A. Boone for all purposes.  (See ECF Nos. 5, 8, 9.)

supported by substantial evidence.  For the reasons explained herein, Plaintiff's motion for summary judgment shall be denied, Defendant's cross-motion for summary judgment shall be granted, and Plaintiff's social security appeal shall thus be denied.

## II.

## BACKGROUND

### A.      Procedural History

On June 17, 2019, Plaintiff filed a Title II application for a period of disability insurance benefits alleging a period of disability beginning on October 20, 2017.  (AR 159-60.)  Plaintiff's application was initially denied on August 5, 2019, and denied upon reconsideration on December 24, 2019.  (AR 93-97, 99-104.)  Plaintiff requested and received a hearing before Administrative Law Judge Vincent A. Misenti (the "ALJ").  (AR 105-106, 107-121, 122-146.)  Plaintiff appeared for a telephonic hearing before the ALJ on October 30, 2020.  (AR 31-59.)  On November 20, 2020, the ALJ issued a decision finding that Plaintiff was not disabled.  (AR 12-30.)  The Appeals Council denied Plaintiff's request for review on January 25, 2022.  (AR 1-6.)

On June 4, 2021, Plaintiff filed this action for judicial review.  (ECF No. 1.)  On October 21, 2021, Defendant filed the administrative record ("AR") in this action.  (ECF No. 10.)  Following multiple extensions of the briefing schedule and exchange of confidential letter briefs, on July 28, 2022, Plaintiff filed an opening brief in support of summary judgment.  (Pl.'s Opening Br. ("Br."), ECF No. 27.)  On November 14, 2022, Defendant filed an opposition brief and motion for cross-summary judgment.  (Def.'s Opp'n ("Opp'n"), ECF No. 30.)  Plaintiff filed a reply brief on December 13, 2022.  (Pl.'s Reply Opp'n ("Reply"), ECF No. 33.)

### B.      The ALJ's Findings of Fact and Conclusions of Law

The ALJ made the following findings of fact and conclusions of law as of the date of the decision, November 25, 2020:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2023.

2.  The claimant has not engaged in substantial gainful activity since October 20, 2017, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: fibromyalgia versus chronic fatigue syndrome; diabetes mellitus; degenerative disc disease and osteoarthritis (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift, carry, push or pull up to twenty pounds occasionally and ten pounds frequently. She can sit, stand or walk up to six hours each in an eight-hour workday. She can handle and finger items with the left and right hands frequently. The claimant can climb ramps and stairs occasionally, never climb ladders or scaffolds, and she can occasionally balance, stoop, kneel, crouch, or crawl. She cannot have exposure avoid [sic] bright lights, defined as work exceeding normal fluorescent office lighting or retail store lighting. She can never work at unprotected heights and must avoid concentrated exposure to moving, mechanical parts. She can never work in extreme cold weather. She can work in moderately noisy environments. She is able to understand, remember and carry out simple, routine and repetitive tasks and decisions.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on February 1, 1966 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional

1    capacity, there are jobs that exist in significant numbers in the national economy that

2    the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

3        11. The claimant has not been under a disability, as defined in the Social Security Act,

4            from October 20, 2017, through the date of this decision (20 CFR 404.1520(g)).

5    (AR 17-26.)

6                                        **III.**

7                                **LEGAL STANDARD**

8    **A.    The Disability Standard**

9        To qualify for disability insurance benefits under the Social Security Act, a claimant must

10   show she is unable "to engage in any substantial gainful activity by reason of any medically

11   determinable physical or mental impairment[2] which can be expected to result in death or which

12   has lasted or can be expected to last for a continuous period of not less than 12 months."  42

13   U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five-step sequential evaluation

14   process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520;[3] Batson v.

15   Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the

16   sequential evaluation in assessing whether the claimant is disabled are:

17            Step one: Is the claimant presently engaged in substantial gainful
             activity?  If so, the claimant is not disabled.  If not, proceed to step
18           two.

19            Step two: Is the claimant's alleged impairment sufficiently severe
             to limit his or her ability to work?  If so, proceed to step three.  If
20           not, the claimant is not disabled.

21            Step three: Does the claimant's impairment, or combination of
             impairments, meet or equal an impairment listed in 20 C.F.R., pt.
22           404, subpt. P, app. 1?  If so, the claimant is disabled.  If not,
             proceed to step four.

23
24            Step four: Does the claimant possess the residual functional

25   [2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities
     that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

26   [3] The regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq., and the regulations
27   which apply to SSI benefits, 20 C.F.R. §§ 416.901 et seq., are generally the same for both types of benefits.
     Accordingly, while Plaintiff seeks only Social Security benefits under Title II in this case, to the extent cases cited
28   herein may reference one or both sets of regulations, the Court notes these cases and regulations are applicable to the
     instant matter.

> capacity ("RFC") to perform his or her past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).  The burden of proof is on the claimant at steps one through four.  Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020).  A claimant establishes a *prima facie* case of qualifying disability once she has carried the burden of proof from step one through step four.

Before making the step four determination, the ALJ first must determine the claimant's RFC.  20 C.F.R. § 416.920(e); Nowden v. Berryhill, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).   The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e); 416.945(a)(2); Social Security Ruling ("SSR") 96-8p, available at 1996 WL 374184 (Jul. 2, 1996).[4]  A determination of RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion); 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001).

At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform given her RFC, age, education, and work experience.  20 C.F.R. § 416.912(g); Lounsbury v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006).   To do this, the ALJ can use either the Medical Vocational

---

[4] SSRs are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner.  20 C.F.R. § 402.35(b)(1).  While SSRs do not have the force of law, the Court gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989); see also Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir. 2006).

1  Guidelines ("grids"), or rely upon the testimony of a VE.  See 20 C.F.R. § 404 Subpt. P, App. 2;

2  Lounsbury, 468 F.3d at 1114; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).

3  "Throughout the five-step evaluation, the ALJ is responsible for determining credibility,

4  resolving conflicts in medical testimony, and for resolving ambiguities.' "  Ford, 950 F.3d at

5  1149 (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

6        **B.    Standard of Review**

7        Congress has provided that an individual may obtain judicial review of any final decision

8  of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).

9  In determining whether to reverse an ALJ's decision, the Court reviews only those issues raised

10  by the party challenging the decision. See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir.

11  2001).  Further, the Court's review of the Commissioner's decision is a limited one; the Court

12  must find the Commissioner's decision conclusive if it is supported by substantial evidence.  42

13  U.S.C. § 405(g); Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019).  "Substantial evidence is

14  relevant evidence which, considering the record as a whole, a reasonable person might accept as

15  adequate to support a conclusion."  Thomas v. Barnhart (Thomas), 278 F.3d 947, 954 (9th Cir.

16  2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995));

17  see also Dickinson v. Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence

18  standard to the deferential clearly-erroneous standard).  "[T]he threshold for such evidentiary

19  sufficiency is not high."  Biestek, 139 S. Ct. at 1154.  Rather, "[s]ubstantial evidence means

20  more than a scintilla, but less than a preponderance; it is an extremely deferential standard."

21  Thomas v. CalPortland Co. (CalPortland), 993 F.3d 1204, 1208 (9th Cir. 2021) (internal

22  quotations and citations omitted); see also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

23  Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is

24  harmless.  Stout, 454 F.3d at 1055–56.  Moreover, the burden of showing that an error is not

25  harmless "normally falls upon the party attacking the agency's determination."  Shinseki v.

26  Sanders, 556 U.S. 396, 409 (2009).

27        Finally, "a reviewing court must consider the entire record as a whole and may not affirm

28  simply by isolating a specific quantum of supporting evidence."  Hill v. Astrue, 698 F.3d 1153,

1159 (9th Cir. 2012) (quoting <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)). Nor may the Court affirm the ALJ on a ground upon which he did not rely; rather, the Court may review only the reasons stated by the ALJ in his decision.  <u>Orn v. Astrue</u>, 495 F.3d 625, 630 (9th Cir. 2007); <u>see also</u> <u>Connett v. Barnhart</u>, 340 F.3d 871, 874 (9th Cir. 2003).  Nonetheless, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  <u>Ford</u>, 950 F.3d at 1154 (quoting <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005)).

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff presents two challenges: (1) that the ALJ's rejection of the State Agency physicians' handling limitations was not supported by substantial evidence; and (2) the ALJ's rejection of Dr. Khanna's opinion was not supported by substantial evidence.  (Br. 12-18.)  For the reasons explained below, the Court concludes the ALJ did not make any reversible error.

### A.    Legal Standard for Weighing Medical Opinion and Other Medical Findings

Where, as here, a claim is filed after March 27, 2017, the revised Social Security Administration regulations apply to the ALJ's consideration of the medical evidence.  <u>See</u> <u>Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions)</u>, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.  Under the updated regulations, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Thus, the new regulations require an ALJ to apply the same factors to all medical sources when considering medical opinions, and no longer mandate particularized procedures that the ALJ must follow in considering opinions from treating sources.  <u>See</u> 20 C.F.R. § 404.1520c(b) (the ALJ "is not required to articulate how [he] considered each medical opinion or prior administrative medical finding from one medical source individually."); <u>Trevizo v. Berryhill</u>, 871 F.3d 664, 675 (9th Cir. 2017).  As recently acknowledged by the Ninth Circuit,

1   this means the 2017 revised Social Security regulations abrogate prior precedents requiring an

2   ALJ to provide "clear and convincing reasons" to reject the opinion of a treating physician where

3   uncontradicted by other evidence, or otherwise to provide "specific and legitimate reasons

4   supported by substantial evidence in the record, " where contradictory evidence is present.

5   Woods v. Kijakazi, 32 F.4th 785, 788–92 (9th Cir. 2022).

6        Instead, "[w]hen a medical source provides one or more medical opinions or prior

7   administrative medical findings, [the ALJ] will consider those medical opinions or prior

8   administrative medical findings from that medical source together using" the following factors:

9   (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; [and] (5)

10  other factors that "tend to support or contradict a medical opinion or prior administrative medical

11  finding."  20 C.F.R. §§ 404.1520c(a), (c)(1)–(5).  The most important factors to be applied in

12  evaluating the persuasiveness of medical opinions and prior administrative medical findings are

13  supportability and consistency.  20 C.F.R. §§ 404.1520c(a), (b)(2).  Regarding the supportability

14  factor, the regulation provides that the "more relevant the objective medical evidence and

15  supporting explanations presented by a medical source are to support his or her medical

16  opinion(s), the more persuasive the medical opinions … will be."  20 C.F.R. § 404.1520c(c)(1).

17  Regarding the consistency factor, the "more consistent a medical opinion(s) is with the evidence

18  from other medical sources and nonmedical sources in the claim, the more persuasive the

19  medical opinion(s) … will be."  20 C.F.R. § 404.1520c(c)(2).

20       Accordingly, the ALJ must explain in her decision how persuasive she finds a medical

21  opinion and/or a prior administrative medical finding based on these two factors.  20 C.F.R. §

22  404.1520c(b)(2).  The ALJ "may, but [is] not required to, explain how [she] considered the

23  [other remaining factors]," except when deciding among differing yet equally persuasive

24  opinions or findings on the same issue.  20 C.F.R. §§ 404.1520c(b)(2)–(3).  Further, the ALJ is

25  "not required to articulate how [she] considered evidence from nonmedical sources."  20 C.F.R.

26  § 404.1520c(d).  Nonetheless, even under the new regulatory framework, the Court still must

27  determine whether the ALJ adequately explained how she considered the supportability and

28  consistency factors relative to medical opinions and whether the reasons were free from legal

1   error and supported by substantial evidence.  See Martinez V. v. Saul, No. CV 20-5675-KS,

2   2021 WL 1947238, at *3 (C.D. Cal. May 14, 2021).

3   **B.     The ALJ Did Not Err in Rejecting the State Agency Physicians' Opined**
        **Handling Limitations**

4

5   Plaintiff contends the ALJ's rejection of Dr. Wong and Dr. Shibuya's limitations

6   regarding the "occasional handling with the left upper extremity" is based on only the ALJ's

7   vague determination that "there are minimal findings or complaints related to her left upper

8   extremity," and thus not supported or consistent with the objective and subjective evidence of

9   record as considered by the state agency physicians.  Specifically, Plaintiff argues the ALJ fails

10  to address the objective evidence of record documenting objectively and subjectively

11  documented limitations on her ability to use her hands that the state agency physicians noted as

12  supporting the "occasional" limitations, including failing to address: the fact that Dr. Ma

13  prescribed bilateral wrist splints and occupational therapy due to findings of bilateral carpel

14  tunnel syndrome ("CTS") (AR 544); objective examination findings of "positive" Tinel's sign

15  over the left median nerve at the wrist (AR 432); multiple examination findings of pain at the

16  second through fifth metacarpophalangeal joint (MCP) joints bilaterally, worse on the left; and

17  pain to the left thumb interphalangeal (IP) joint and the thumb carpometacarpal (CMC) joint, and

18  painful wrists (AR 392-393; 396-397; 604-605; 897-898).

19  Plaintiff further argues the ALJ fails to mention her documented consistent complaints

20  regarding her limitations with her left upper extremity including: a treatment record from Dr. Ma

21  dated November 26, 2018, documenting "throbbing" pain in both hands (AR 526); a treatment

22  record from Dr. Goyal at Stanford Neuromuscular Disease Clinic dated February 13, 2019,

23  documenting that her symptoms were "gradually progressive" and noting that she had a sense of

24  "heaviness" and "weakness" on the left side (AR 435); a treatment record dated February 13,

25  2020, from Dr. Khanna documenting 7/10 pain in her wrists (AR 897); a treatment record dated

26  April 21, 2020, from Dr. Morris documenting pain in her left arm (AR 759); and a treatment

27  record from Dr. Khanna documenting polyarthralgia in the hands and wrists (AR 905).  (Br. 13-

28  14.)  Finally, Plaintiff argues the ALJ fails to mention her testimony regarding her handling

1   limitations, specifically that that she has CTS in both of her wrists, "so it's difficult to keep my

2   hands like in keyboard position and type, like I used to . . . I can't use a potato peeler"; that it

3   hurts to bend her hands on her wrists; that she had an EMG with Dr. Ma on January 2019; that

4   she would drop things because "my hands would just –my wrist would just give out"; and that

5   she has been prescribed arm braces to be worn every night.  (AR 45.)

6        Defendant responds that in examining evidence related to Plaintiff's hands, the ALJ

7   considered the March 2018 EMG study showing mild carpal tunnel syndrome and cubital tunnel

8   syndrome, and positive Tinel's sign over the left wrist in March 2019 (AR 22, 432, 511),

9   however, also considered other evidence, which the ALJ detailed earlier in the decision, that

10  supported the ALJ's ultimate conclusion that occasional handling was inconsistent with other

11  evidence (AR 24).  The Court agrees with Defendant.

12       Plaintiff replies that Defendant provides *post-hoc* rationalizations on behalf of the ALJ.

13  The Court disagrees, as for the reasons explained below, the Court finds the ALJ's opinion and

14  reasoning supported by substantial evidence analyzed and cited expressly in the ALJ's opinion,

15  and any additional evidence cited in the opposition brief only reinforces a finding that the ALJ's

16  citations and analysis were supported by substantial evidence in the record.  The Court concludes

17  the ALJ properly weighed the factors of supportability and consistency in the opinion, and such

18  analysis is supported by substantial evidence in the record.

19       The ALJ summarized and weighed the state agency physician opinions as follows:

20           Dr. Wong, the non-examining State Agency physician who
             reviewed the documentary evidence on August 2, 2019, concluded
21           that the claimant can perform light work (Exhibit 1A). She can
             occasionally climb, balance, stoop, kneel, crouch, or crawl. She
22           can occasionally perform handling with the left upper extremity.
             Dr. Shibuya, the non-examining State Agency physician who
23           reviewed the documentary evidence on December 18, 2019,
             concluded that the claimant can perform light work (Exhibit 1A).
24           She can occasionally climb, balance, stoop, kneel, crouch, or
             crawl. She can occasionally perform handling with the left upper
25           extremity. She should avoid concentrated exposure to cold. These
             opinions are mostly persuasive, as they are supported by the
26           relevant objective medical evidence available at the time they were
             rendered and by supporting explanations that he provided. The
27           undersigned has not adopted the limitation regarding occasional
             handling with the left upper extremity, as the longitudinal
28           treatment evidence indicates minimal findings or complaints

1
2
3

> related to her left upper extremity. However, additional limitations have been incorporated in the residual functional capacity determination set forth herein in light of evidence that was received subsequent to the review by Dr. Wong and Dr. Shibuya.

4

(AR 24.)

5

6      As noted above, Plaintiff argues, in part, that the ALJ fails to mention a treatment record

7   from Dr. Ma dated November 26, 2018 documenting "throbbing" pain in both hands (AR 526),

8   and a treatment record from Stanford Neuromuscular Disease Clinic, dated February 13, 2019.

9   The Court first notes the ALJ did reference a later treatment note dated November 25, 2019,

10  from Stanford Neuromuscular Disease Clinic:

11
12      > On November 25, 2019, the claimant reported that Lyrica was helpful and she found it "helpful to get going in the course of the day" (Exhibit 11F, page 7). She was in no acute distress. Upon physical examination, she moved all extremities spontaneously without gross limitations. She had no tender points on palpation and she had no joint swelling.
13

14  (AR 22.)  The ALJ again referenced this record when the ALJ made the following findings

15  concerning Plaintiff's hand impairments, in addition to referencing a positive Tinel's sign in

16  March of 2019 (the relatively same time period that Plaintiff's briefing highlights the Stanford

17  February 13, 2019 record was ignored), and then referenced the later November 25, 2019

18  Stanford record, and a November 14, 2019 note from Dr. Khanna:

19
20      > With regard to the claimant's hands, an EMG study dated March 13, 2018 showed mild median demyelinating neuropathy at both wrists consistent with carpal tunnel syndrome and mild neuropathy at the elbows consistent with cubital tunnel syndrome (Exhibit 7F, page 50). The claimant had positive Tinel's sign over the left wrist on March 13, 2019 (Exhibit 6F, page 6). On November 25, 2019, the claimant moved all extremities without limitation (Exhibit 11F, page 7). Her joints had no swelling. On November 14, 2019, Dr. Khanna noted hand pain that he thought was from hypermobility (Exhibit 14F, page 19).
21
22
23
24

25  (AR 22.)

26      Significantly, the ALJ then highlighted the later November 25, 2019, Stanford

27  Neuromuscular Disease Clinic record that documented Plaintiff's history of noncompliance with

28  that medical provider, which is essentially the time period following the February 13, 2019

1  Stanford record that Plaintiff complains was ignored:

> However, it appears that the claimant's vague and ambiguous pain
> and fatigue complaints are not otherwise reflected by substantial
> clinical findings, physical abnormalities or defects and the record
> repeatedly documents symptom control with regular use of the
> medication Lyrica. She also has a history of noncompliance,
> failing to follow up with referrals to specialists from Stanford Pain
> Clinic. On November 25, 2019, chart notes from Stanford Health
> Care state that the claimant "unfortunately, over the last several
> months, the patient was either a no-show for or had cancellations
> either through our clinic or on her side of physical therapy and pain
> psychology consultation appointments" and evaluations were never
> done (Exhibit 11F, page 7). She has a good gait and normal
> musculoskeletal exam findings noted at Exhibit 12F. She also has a
> fairly active lifestyle, which includes taking her son to school,
> going on a four mile hike with him, doing housework and the
> laundry, cooking and dish washing, and caring for her pets. Her
> carpal tunnel syndrome has not required surgery and it is
> inconsistent with her hobby of crocheting items for the homeless,
> driving, writing cards for soldiers, attending boy scout and school
> meetings, making neckerchiefs for the boy scouts, and attending
> church (hearing testimony). She admitted that conservative
> modalities have improved her symptoms but she had to stop such
> treatments due to insurance reasons.

14  (AR 23.)

15      Defendant also highlights this portion of the opinion where the ALJ explained that carpal

16  tunnel syndrome "has not required surgery and is inconsistent with her hobby of crocheting items

17  for the homeless, driving, writing cards for soldiers, attending boy scout and school meetings,

18  making neckerchiefs for the boy scouts, and attending church." (AR 23.) While the testimony

19  was somewhat qualified in certain regards that were not expressly mentioned in the ALJ's

20  opinion, Plaintiff's testimony excerpted below was reasonably utilized by the ALJ and

21  substantial evidence supports the ALJ's findings:

> I'm good at folding clothes. So I do laundry; have a wheeled
> basket. I do dishes in the morning. I can't do them in the
> afternoon, 'cause I'm spent. I dust. I feed the pets in the morning.
> Al these have to be in the morning, 'cause I can't do past 11:00
> a.m. I have two rabbits and a dog - - a small dog and cat that I feed
> and change their water. I try to cook things in the morning, so
> they'll be ready for the dinnertime, because I can't make it at
> dinnertime. Yeah, I wipe the sinks down. If I have a stool, I could
> scrub a toilet. That's about it.
>
> Q      Okay. With respect to outside activities and interests,
> where do you go and what do you do, when you leave the
> residence?

A       I go either to the store, to take my son to Boy Scout meetings.  I go to school meetings, when it was open.  And doctor appointments or the post office.  That's about it.

Q       All right.   And do you participate in any Boy Scout activities?

A       I do help sew the neckerchiefs, if they let me go at my own pace.  So they'll drop off like 200 pieces of material, and it'll take me a couple months to get them hemmed.

Q       Okay.  Any other Scout-related activities?

A       When they have community service activities, I go and sit.  I don't really do anything.  But I - - you know, I'm a registered adult, so I sit there and supervise.  'Cause they need so many adults.  That's it.  I get too tired to pick something you have to go out of town for . . .

A       Before [COVID] we would go [to church] once a week.  My son would take us.

Q       Okay.  Do you have any hobbies?

A       I like to crochet and do - - crochet for the shelter animals, their beds; and for the homeless, I make baby blankets and scarves to give to either the homeless or the fireman to hand out . . .

. . . [and] I write birthday cards out to the . . . Navy, the sailors.  'Cause my son's in the Navy and a submariner, so all of us moms send birthday cards to each of them, every month.  It may be seven to ten a month.  So I just write one or two every week, and then I mail them.

(AR 47-48.)   The Court finds the ALJ's comparison of daily activities to the opined handling

limitations is supported by substantial evidence.  See <u>Ford</u>, 950 F.3d at 1154–55 ("The ALJ also

stated that Dr. Medani's opinion was inconsistent with Ford's activity level . . . [and] [a] conflict

between a treating physician's opinion and a claimant's activity level is a specific and legitimate

reason for rejecting the opinion."); <u>Martinez v. Kijakazi</u>, No. 1:20-CV-00555-HBK, 2022 WL

769906, at *9 (E.D. Cal. Mar. 14, 2022) (same).

        While Plaintiff argues the ALJ fails to mention a treatment record from Dr. Ma dated

November 26, 2018 documenting "throbbing" pain, the ALJ *did* cite to the treatment record from

Dr. Ma dated November 26, 2018, in that the ALJ utilized the record's reference to the March

2018 imaging results to analyze the condition.  Specifically the ALJ stated: "With regard to the

1   claimant's hands, an EMG study dated March 13, 2018 showed mild median demyelinating

2   neuropathy at both wrists consistent with carpal tunnel syndrome and mild neuropathy at the

3   elbows consistent with cubital tunnel syndrome (Exhibit 7F, page 50)."  This record, Ex. 7F at

4   50, is the November 26, 2018 treatment note that Plaintiff complains the ALJ ignored because

5   the ALJ did not expressly state that it contained a note of throbbing hands.  The Court does not

6   find this absence of noting throbbing hands to demonstrate the ALJ ignored relevant evidence;

7   rather, this citation demonstrates the ALJ did appropriately consider the longitudinal record.

8        Further, the treatment note from Dr. Ma dated November 26, 2018, while reporting

9   throbbing in the hands, also states that occupational therapy and that use of a wrist splint "seems

10  to be helpful."  (Ex. 7F at 50-51, AR 525-26.)  Plaintiff was directed to continue with a wrist

11  splint.  An earlier April 3, 2018 record noted the throbbing, directed Plaintiff to continue using

12  the wrist splint, but did not yet state that the wrist splint and occupational therapy was helpful.

13  (AR 542-44, 566.)  On June 5, 2018, a physical therapy note, with primary diagnosis of low back

14  pain, noted that Plaintiff had been going to occupational therapy for upper extremity complaints;

15  that she has been able to do normal activities of daily living "with primarily fatigue complaints."

16  (Ex. 8F at 2, AR 547.)

17       In this regard, the ALJ recognized that Plaintiff "admitted that conservative modalities

18  have improved her symptoms but she had to stop such treatments due to insurance reasons."

19  (AR 23.)  Testimony before the ALJ referenced Dr. Ma's use of the imaging to diagnose carpal

20  tunnel, the lack of surgery, and that the wrist braces helped:

21       A.    I have it in both of my wrists, so it's difficult to keep my
              hands like in keyboard position and type, like I used to.  It's - - I
22            can't use a potato peeler, so - -

23       Q    Well, can you tell me your symptoms, first?

24       A    My symptoms?

25       Q    Yes, in your hands.

26       A    It hurts to bend my hands, on my wrists.  An I didn't realize
              I had it until I had a EMG done, and she confirmed it.
27
         Q    When was this?
28

14

1    A      This was, I think, January of 2019, with Dr. Ma . . .

2    A      It hurt to lean on my hands.  It hurt to, you know, use your
     hands to lift yourself off of a chair or something.  And washing
3    dishes was tricky, because I kept dropping things, being 'cause my
     hands would just - - my wrist would just give out.
4
     Q      Okay.  Have you had surgery?
5
     A      Not on my wrists, no.
6
     Q      What kind of treatment have you gotten for your carpal
7    tunnel syndrome?

8    A      I have arm braces that I'm supposed to wear every night.
     And it does help.
9
     Q      All right.   Any other treatment for your carpal tunnel
10   syndrome?

11   A      No.

12   (AR 45-46.)  Plaintiff does not directly address the reliance on conservative treatment in reply

13   briefing.  (See Reply 2-6.)

14         The Court recognizes, as the ALJ did, that the Plaintiff referenced stopping treatment due

15   to insurance.  In weighing symptom testimony under the clear and convincing standard, courts

16   often reference an unexplained or inadequately explained failure to follow treatment, in addition

17   to conservative treatment.  See Orn, 495 F.3d at 636 ("Factors that an ALJ may consider in

18   weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony

19   or between testimony and conduct, daily activities, and 'unexplained, or inadequately explained,

20   failure to seek treatment or follow a prescribed course of treatment.' ") (citation omitted); Velez

21   v. Kijakazi, No. 18-17175, 2021 WL 4553634, at *1 (9th Cir. Oct. 5, 2021) ("The ALJ gave

22   specific, clear and convincing reasons for discounting Velez's testimony regarding the severity of

23   his symptoms, including that his testimony was not supported by the objective medical record,

24   his course of treatment was conservative, and he exhibited noncompliance with diabetes

25   treatment."); Al-Uqdah v. Astrue, No. CV-09-5208-JFW (AN), 2010 WL 2696858, at *4 (C.D.

26   Cal. May 21, 2010) (collecting cases referring to both conservative treatment, and failure to

27   follow prescribed course of treatment without explanation).  Thus, conservative treatment is

28   recognized as different than a failure to generally follow other prescribed treatments, and such

distinction is supported by logic in that there is a difference between a failure to receive treatment supported by a justification or excuse, and simply factoring that a claimant is only prescribed conservative treatment or factoring that conservative treatment is helpful.

This Court has recognized that conservative treatment may be an appropriate factor in weighing a medical opinion or weighing symptom testimony. See Warecki v. Comm'r of Soc. Sec., No. 120CV01519BAKSAB, 2022 WL 2901606, at *9 (E.D. Cal. July 22, 2022) ("As to the characterization of Plaintiff's treatment as 'conservative,' generally speaking, evidence of conservative treatment may constitute a legitimate reason to discount a claimant's symptoms or a physician's opinion." (citing Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007))).[5]  The Court finds here that the ALJ appropriately considered that conservative treatment helped Plaintiff. See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) ("Dr. Young described Rollins as a '[w]ell developed, well nourished middle aged female in no acute distress' and prescribed a conservative course of treatment, including a recommendation to "avoid strenuous activities[,]" [and] [t]hese are not the sort of description and recommendations one would expect to accompany a finding that Rollins was totally disabled under the Act."); Aurelio A. v. Saul, No. 19-CV-01645-JLB, 2020 WL 10321754, at *9 (S.D. Cal. Oct. 28, 2020) ("An ALJ may discount a physician's opinion based in part on the claimant's conservative treatment."); Hanes v. Colvin, 651 F. App'x 703, 705 (9th Cir. 2016) ("[T]he ALJ reasonably relied on his findings regarding Hanes's daily activities, her conservative treatment, and her positive response to that treatment to conclude that the assessments of Dr. Hawkins and Dr. Pena were inconsistent with the objective evidence in the record.").

Defendant also argues the ALJ discussed relevant examination findings that supported a lesser restriction in handling.  Again, the ALJ stated as to Dr. Wong and Dr. Shibuya's opinions, that "[t]he undersigned has not adopted the limitation regarding occasional handling with the left

---

[5]  In Warecki, the Court found under the specific and legitimate standard, the ALJ's use of conservative treatment was vague and not supported by substantial evidence in the record.  2022 WL 2901606, at *9 ("Here, however, since the ALJ neither identifies which treatments he characterizes as 'conservative' nor identifies purportedly 'aggressive' treatments Plaintiff could, but did not, pursue, the Court cannot conclude the ALJ's finding that Plaintiff's treatments were 'conservative' is properly supported by substantial evidence.").  The Court finds here, under the new regulations and given the opinion and record as a whole, the ALJ properly relied in part on the fact conservative treatment helped Plaintiff.

1  upper extremity, as the longitudinal treatment evidence indicates minimal findings or complaints

2  related to her left upper extremity."

3          As stated above, the ALJ discussed the treatment note dated November 25, 2019 from

4  Stanford Neuromuscular Disease Clinic, where "[u]pon physical examination, she moved all

5  extremities spontaneously without gross limitations . . . had no tender points on palpation and she

6  had no joint swelling" (AR 22); and again referenced this record in regard to Plaintiff's hand

7  impairments noting "[o]n November 25, 2019, the claimant moved all extremities without

8  limitation" (AR 22).   The ALJ also referenced that Plaintiff had "a good gait and normal

9  musculoskeletal exam findings noted at Exhibit 12F" (AR 22), further specifically noting that

10 "[o]n September 8, 2020, she was in no acute distress and had normal musculoskeletal range of

11 motion with no focal neurological deficits and normal motor strength (Exhibit 12F, page 19)."

12 (AR 22, citing AR 786; see also AR 780 (noting unremarkable extremities on November 7,

13 2019).)   Given these statements and citations, in conjunction with the other reasoning discussed

14 above, the Court finds substantial evidence in the record to support the ALJ's finding that the

15 longitudinal record did not support the limitations as to the left upper extremity.   See Woods, 32

16 F.4th at 792–93 ("The ALJ found this opinion unpersuasive because it was inconsistent with the

17 overall treating notes and mental status exams in the record.").

18         Finally, the ALJ discussed that Plaintiff's doctor thought ongoing hand pain was due to

19 another cause—hypermobility (AR 22, 398, 884).   Specifically, the ALJ noted the record in

20 relation to a similarly dated one: "On November 25, 2019, the claimant moved all extremities

21 without limitation (Exhibit 11F, page7).   Her joints had no swelling.   On November 14, 2019,

22 Dr. Khanna noted hand pain that he thought was from hypermobility."   (AR 22.)   Plaintiff does

23 not address this reasoning in the reply.   The Court concludes the ALJ's recognition of the exam

24 note in relation to other records, provides additional support to the ALJ's findings concerning

25 supportability and consistency applied to the opinions of Dr. Wong and Dr. Shibuya.

26         Having discussed relevant evidence earlier in the decision, the Court agrees with

27 Defendant that the ALJ's conclusion regarding the state agency doctors' restriction on handling

28 was appropriately articulated and supported by substantial evidence.   For all of the above

1   reasons, the Court finds the ALJ adequately addressed the factors of supportability and

2   consistency, by accepting the opinions as supported in one regard (AR 24 ("These opinions are

3   mostly persuasive, as they are supported by the relevant objective medical evidence available at

4   the time they were rendered and by supporting explanations that he provided"), and finding them

5   unsupported by and inconsistent with the other evidence in the record as to the handling

6   limitations of the upper left extremity.   However, the Court notes the ALJ could more clearly

7   explain the reasoning as guided by the applicable regulation terms.   See Woods, 32 F.4th at 793

8   n.4 ("Although the ALJ's meaning here is clear from context, to avoid confusion in future cases,

9   ALJs should endeavor to use these two terms of art—"consistent" and "supported"—with

10  precision.").

11        **B.        The ALJ Did Not Err in Rejecting Dr. Khanna's "Opinion" or "Assessment"**

12        Plaintiff argues the ALJ's rejection of Dr. Khanna's opinion that Plaintiff could not

13  perform sedentary work is not supported by substantial evidence.   Dr. Khanna, determined that

14  Plaintiff was "totally disabled even for the most sedentary of work" (e.g., AR 375, 390, 606),

15  which the ALJ rejected as "not persuasive" opining:

16          Dr. Khanna's opinion is not persuasive. At various times he has
            indicated that the claimant was temporarily disabled. Chart notes
17          from Dr. Khanna dated May 4, 2018 state that "I do believe she is
            totally disabled at this point" (Exhibit 7F, page 56). On August 17,
18          2018, Dr. Khanna noted that "I currently think she is totally
            disabled even for the most sedentary of work," and th[at] he was
19          going to keep her off work until January 1, 2019 (Exhibit 5F, page
            9). On February 14, 2019, Dr. Khanna noted he would extend her
20          disability until June 15, 2019 (Exhibit 5F, page 28). He extended
            disability again on May 16, 2019 (Exhibit 14F, page 2). On August
21          15, 2019, he again indicated he was "going to continue to keep her
            off work as (I) do not think she can do even sedentary work"
22          (Exhibit 9F, page 4). On November 14, 2019, he wrote that she
            was "still totally disabled" (Exhibit 9F, page 9). On February 13,
23          2020, Dr. Khanna indicated he was going to extend her disability
            to June 1, 2020 (Exhibit 13F, page 30). On June 24, 2020, he
24          indicate that he did not feel she could go back to work "at this
            point" and planned on writing "another letter" (Exhibit 14F, page
25          28).

26          His comments regarding temporary disability are conclusory,
            without adequate explanation or support from the relevant
27          objective medical evidence. Whether the claimant is "disabled" is a
            determination reserved to the Commissioner. Furthermore, the
28          opinion is inconsistent with the objective evidence from other

1        medical sources and nonmedical sources.

2 (AR 24.)

3        Plaintiff submits the ALJ fails to address two significant portions of Dr. Khanna's

4 opinion.  First, although some of Dr. Khanna's findings concerned "temporary" disability (AR

5 394), Plaintiff contends the ALJ fails to address the fact that Dr. Khanna's restrictions to

6 "sedentary work" stemmed consistently across and over a twelve month period from August 17,

7 2018, where Dr. Khanna concluded that "I currently think she is disabled for even the most

8 sedentary work" discussing Plaintiff's fibromyalgia and related diagnoses (AR 374-375),

9 through at least the most recent medical record dated June 24, 2020 where Dr. Khanna stated that

10 "I think she is quite symptomatic from fibromyalgia.  The shoulder pain she describes sound

11 suspicious for shoulder impingement syndrome.  I will check her for polymyositis.  I don't think

12 she can go back to work at this point." (AR 907).  Plaintiff emphasizes Dr. Khanna never stated

13 that Plaintiff could return to work activity during the time period at issue.  Therefore, Plaintiff

14 argues Dr. Khanna's functional limitations meet the required duration requirement to find

15 someone "disabled" pursuant to the SSA rules and regulations, and pursuant to the new treating

16 physician rules, an ALJ continues to be required to consider the "supportability" and

17 "consistency" of all medical opinions with the evidence of record.

18        Defendant first responds that Plaintiff mis-reads Dr. Khanna's notes by suggesting that

19 the doctor restricted her to sedentary work, proffering Dr. Khanna never stated that Plaintiff

20 could perform sedentary work.  Instead, Defendant argues the dictated notes state Plaintiff was

21 "totally disabled even for the most sedentary of work."  (AR 375, 606.)  Thus, Defendant

22 contends the assessment was the Plaintiff could not do *any* work, which he contrasted against the

23 idea that Plaintiff could do sedentary work.  Defendant submits that the ALJ was only required to

24 address opinion evidence, which the revised regulations now more narrowly define as a

25 statement from a medical source about what a claimant can still do despite impairments, and

26 whether the claimant is functionally restricted in the demands of work activities such as sitting,

27 standing, walking, lifting, carrying, pushing, pulling, or other physical functions.  See 20 C.F.R.

28 § 404.1513(a)(2).  Defendant submits Dr. Khanna did not give any functional assessments (i.e.,

1   opinions) regarding Plaintiff's ability to perform these functions, contrary to Plaintiff's
2   characterization of these notes.

3          Second and relatedly, Defendant argues the ALJ correctly concluded that he was not
4   required to adopt Dr. Khanna's assessments of disability, even if the doctor mentioned the word
5   "sedentary" in a comparative fashion.  Defendant suggests Plaintiff's argument takes this word
6   out of context, as the doctor's point in these notes was that Plaintiff was disabled, and the
7   regulations instruct adjudicators to "consider" medical opinions, but the doctor did not provide
8   any opinions as defined in the regulations.  Defendant submits the instant case is therefore
9   facially distinguishable from the cases that Plaintiff relies upon.

10         Finally, Defendant somewhat confusing states that "to the extent that Plaintiff argues the
11  ALJ could not simply (and accurately) state that the assessment of disability was not persuasive,
12  the ALJ did so," and that "[t]he ALJ explained that (1) doctor did not adequately explain or
13  support his assessments with relevant objective medical evidence, and (2) the doctor's
14  assessments of disability were inconsistent with objective evidence in the record from other
15  sources."  (AR 24).  In this regard, Defendant somewhat conclusory fashion states "[a]s to the
16  latter, the ALJ reviewed the relevant objective findings earlier in the decision (AR 21-23)."
17  (Opp'n 9.)

18         In reply, Plaintiff argues regardless of whether Dr. Khanna was limiting Ms. Rodin to
19  sedentary work, the ALJ was required to address this treating physician opinion regarding its
20  "supportability" with Dr. Khanna's own records and "consistency" with the remainder of the
21  record per the requirements of 20 CFR §404.1520c; and that Dr. Khanna was not issuing an
22  administrative opinion as to whether Plaintiff is ultimately "disabled" or is "unable to work" per
23  SSA rules and regulations, rather Dr. Khanna's conclusions are based on his objective
24  examination and testing findings and his professional expertise.  See Miranda J. L. v. Comm'r
25  SSA, 3:19-cv-00321-CL, 2020 WL 4207545, at *5 (D. Or. July 22, 2020) (while "[n]o special
26  significance is given to opinions on issues reserved for the Commissioner, however, the ALJ
27  must nonetheless consider the opinion along with 'all of the medical findings and other evidence
28  that support a medical source's statement that you are disabled.' ").

First, while Defendant correctly highlights the issue of whether this is a medical opinion under the regulations, Defendant's briefing on this issue was not overly helpful, providing no caselaw as to differing applications of the regulations to physician records.  The Defendant should have provided more analysis as to whether the ALJ's discussion of supportability and consistency would be sufficient if considered a "medical opinion," particularly given the ALJ here *did* refer to Dr. Khanna's records as an "opinion," and did address the factors of supportability and consistency.  (AR 24.)

Similarly, Plaintiff's reply, while arguing the ALJ was required to address the factors of supportability and consistency, does not directly address the Defendant's argument that Dr. Khanna's assessments were not a "medical opinion" as defined in the 2017 regulatory amendments in a meaningful fashion, and only provides one case as to the issue.  In that regard, the case cited by Plaintiff in reply, while it discusses "issues reserved for the Commissioner," does not discuss the new regulations and the new definition of medical opinions applicable to this claim.  See Miranda J. L., 2020 WL 4207545, at *5 (applying specific and legitimate standard to weighing physician opinion) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).  In reply, Plaintiff focuses on the conclusions that the ALJ did recognize and excerpt in the opinion, and the examination findings, and diagnoses, that corresponded with those conclusions on certain dates. (Reply 7-9.)  For the reasons explained below, the weight of the caselaw applying the new regulatory standards counsels the Court to find the records highlighted by Plaintiff in reply (Reply 7-9), are more akin to "other medical evidence" rather than a "medical opinion," given the absence of sufficient specified statements about what Plaintiff can still do, or specific functional limitations.

Turning to the regulations, for claims filed before March 27, 2017, a "medical opinion" is defined as follows:

> (1) Medical opinions. Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(1).  Following the regulatory changes, for  claims filed on or after

March 27, 2017, the definition of "medical opinion" is clearly more restricted, but still contains some of the same language, such as "what you can still do":

> (2) Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: (For claims filed (see § 404.614) before March 27, 2017, see § 404.1527(a) for the definition of medical opinion.)
>
>> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>>
>> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>>
>> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>>
>> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2)(i)-(iv).   In contrast., "other medical evidence" is now defined as follows, and notably contains other language from the previous definition of "medical opinion":

> (3) Other medical evidence. Other medical evidence is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis. (For claims filed (see § 404.614) before March 27, 2017, other medical evidence does not include a diagnosis, prognosis, or a statement that reflects a judgment(s) about the nature and severity of your impairment(s)).

20 C.F.R. § 404.1513(a)(3).

For claims filed before March 27, 2017, "[o]pinions on some issues . . . are not medical opinions, as described in paragraph (a)(1) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability."   20 C.F.R. § 404.1527(d); see also id. at (d)(1) ("We are responsible for making the determination or decision

about whether you meet the statutory definition of disability . . . we review all of the medical findings and other evidence that support a medical source's statement that you are disabled . . . [but] [a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); id. at (d)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section."); Miranda J. L., 2020 WL 4207545, at *5 (while "[n]o special significance is given to opinions on issues reserved for the Commissioner, however, the ALJ must nonetheless consider the opinion along with 'all of the medical findings and other evidence that support a medical source's statement that you are disabled.' ").

The regulations for claims filed on or after March 27, 2017, provide that "[b]ecause the evidence listed in paragraphs (c)(1) through (c)(3) of this section is inherently neither valuable nor persuasive to the issue of whether you are disabled or blind under the Act, we will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." 20 C.F.R. § 404.1520b(c). The regulation provides in § (c)(3):

> (3) Statements on issues reserved to the Commissioner. The statements listed in paragraphs (c)(3)(i) through (c)(3)(viii) of this section would direct our determination or decision that you are or are not disabled or blind within the meaning of the Act, but we are responsible for making the determination or decision about whether you are disabled or blind:
>
> (i) Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

20 C.F.R. § 404.1520b(c)(3)(i); see also 20 C.F.R. § 416.920b(c); Rokko M. v. Comm'r of Soc. Sec., No. 2:22-CV-29-DWC, 2022 WL 4482625, at *2 (W.D. Wash. Sept. 27, 2022) ("[A]n ALJ need not provide analysis if the evidence is 'neither valuable nor persuasive to the issue,' such as decisions ['] by other governmental agencies and nongovernmental entities,' and 'statements on issues reserved to the Commissioner.' " (quoting 20 C.F.R § 416.920b(c)(1)-(2))); Susan F. v. Kijakazi, No. 20-CV-2201-BAS-DEB, 2022 WL 1694460, at *4 (S.D. Cal. May 26, 2022) ("[T]he opinion that [the plaintiff] is unable to work is not a medical opinion, but is an opinion about an issue reserved for the Commissioner." (quoting Martinez v. Astrue, 261 F. App'x. 33, 35 (9th Cir. 2007))).

Again, neither party provided any on-point caselaw addressing the new regulatory definitions.  The Court's review appears to show courts often do not take an all-or-nothing approach, and attempt to extract portions of records that do qualify as medical opinions, from portions that may touch upon an issue reserved for the Commissioner.

Obviously, courts applying the earlier regulations were more likely to find a medical record to be a "medical opinion" under the then more expansive definition.  See Hougas v. Comm'r of Soc. Sec. Admin., No. CV-19-08039-PHX-SPL, 2020 WL 13490919, at *2 (D. Ariz. Dec. 15, 2020) ("The Commissioner specifically argues Dr. Meier failed to offer a 'medical opinion' because his statement lacked a functional assessment of what Plaintiff could still do despite his impairments . . . The Court disagrees [as [i]nstead, the plain text of the regulation indicates that a medical opinion "reflects judgments about the nature and severity of [the claimant's] impairment(s)" and *may* "includ[e] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." (quoting 20 C.F.R. § 404.1527(a)(1))); McClurkin v. Saul, No. CV 19-00234 JMS-RT, 2020 WL 292187, at *5 (D. Haw. Jan. 21, 2020) ("The Commissioner's interpretation unduly limits what constitutes a medical opinion and misconstrues the plain text of the regulation. The regulation clearly states that medical opinions may '*includ[e]* symptoms, diagnosis and prognosis, what [claimant] can still do despite impairment(s), and [claimant's] physical or mental restrictions[,]' . . . [p]ut differently, such statements of what Claimant 'can still do despite impairment(s)' are sufficient to amount to medical opinions but not necessary.").

The fact the regulations were thus narrowed, in line with the agency was attempting to argue before the regulations, is instructive to their proper application currently, however.  See Hougas v. Comm'r of Soc. Sec. Admin., No. CV-19-08039-PHX-SPL, 2020 WL 13490919, at *2 n.1 (D. Ariz. Dec. 15, 2020) ("In addition, although 20 C.F.R. § 404.1513(a) specifically defines a medical opinion as 'a statement from a medical source about what you can still do despite your impairment(s),' and further classifies 'judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis' as '*other* medical evidence,' it further clarifies that these definitions do

not apply to claims filed before March 27, 2017.").

Given the previous regulations, and the substantive changes, courts recognize the new definitions intend to require a "medical opinion" encompass both functional limitations and what a claimant is still capable of doing.  See 20 C.F.R. § 404.1513(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities."); Jessie L. v. Kijakazi, No. 20-CV-9305-DMR, 2022 WL 2222964, at *14 (N.D. Cal. June 21, 2022) ("In revising the definition of 'medical opinion,' the SSA recognized that '[d]iagnoses and prognoses do not describe how an individual functions' and that although the SSA considers a claimant's statements about his or her symptoms, '[a] more appropriate focus of medical opinions would be perspectives from medical sources about claimants' functional abilities and limitations.' " (quoting 81 Fed. Reg. at 62,562)).  "Thus, a 'medical opinion' must discuss both a claimant's limitations and 'what [the claimant] is still capable of doing' despite those limitations."  Jessie L., 2022 WL 2222964, at *14 (quoting Michael H. v. Saul, 5:20-CV-417 (MAD), 2021 WL 2358257, at *6 (N.D.N.Y. June 9, 2021)); see also Michael H., 2021 WL 2358257, at *6 ("This note presents a close call on what is considered a medical source statement[;] [w]hile it discusses Plaintiff's limitations, it does not discuss what Plaintiff is still capable of doing [and] [u]nder the previous regulations, what a plaintiff could do in spite of their impairments was just one of the listed factors tending to establish the medical provider's judgments about the nature and severity of the plaintiff's impairments . . . [h][owever, under the new regulations, a medical source opinion must do both.").

Turning to recent applications of the regulations, in Carrie, the court first found that a section of a record that appeared to be a recitation of what Plaintiff stated at an appointment, including "[s]he is increasingly, incapacitated and she is unable to work at this point . . . cannot stand for any length of time . . . often has to frequently lay down," did not qualify as a medical opinion, and similarly that a letter from the same doctor to another doctor stating the claimant's condition was "quite debilitating and absolutely makes her a candidate for disability," to be an issue reserved for the Commissioner and not valuable or persuasive.  Carrie D. v. Kijakazi, No.

1:20-CV-03227-LRS, 2022 WL 2901010, at *6 (E.D. Wash. June 6, 2022).  On the other hand, in the same opinion, the court considered the following notes regarding needing to raise legs during flying, to be a medical opinion because the limitations may have corresponding workplace limitations:

> In April and May of 2016, Dr. Shenoi stated that "[w]hile on anticoagulation – she is safe to travel – with keeping active inflight – 5 min ambulation every hr." Tr. 459, 465. Physician's Assistant Foreman repeated this in August of 2016. Tr. 462. Nurse Wiser repeated this in March of 2017. Tr. 456. In April of 2017, Dr. Davis stated that "patient notes that when she is seated raising her legs is substantially beneficial. I have written a letter to her airline asking for considering regarding the same." Tr. 505-06. Plaintiff asserts that the ALJ erred in failing to discuss these statements and argues that these are medical opinions under the regulations. ECF No. 18 at 18.

> Medical opinions are defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one more impairment-related limitations or restrictions" in abilities to meet the physical demands of work. 20 C.F.R. 404.1513(a)(2). The Commissioner defines work as the meeting the demands in an ordinary work setting on a regular and continuing basis, consistent with eight hours a day, five days a week, or equivalent work schedule. S.S.R. 96-8p. It is conceivable that the need to elevate her legs and ambulate routinely during travel may have corresponding workplace limitations. Therefore, on remand, the ALJ will discuss these statements.

Id. at *7.

Some courts have reasonably questioned what it means where a doctor may opine on an issue reserved for the Commissioner, but also provides statements concerning functional limitations that may qualify as a medical opinion, both before and after the new regulations.  See Juniel v. Saul, No. 1:20-CV-0421 JLT, 2021 WL 2349878, at *10 (E.D. Cal. June 9, 2021) (in applying specific and legitimate standard under previous regulations, finding "only the statements from Dr. Bedi that Plaintiff was 'very limited in his ability to perform an occupation due to these disorders' and his 'debilitation [was] permanent' may be rejected as ultimate conclusions reserved for the Commissioner" (quoting Neves v. Comm'r of Social Security, 2017 WL 1079754 at *6 (E.D. Cal. Mar. 21, 2017) ("To be very clear, rejecting the ultimate conclusion concerning disability and rejecting findings concerning work-related limitations are two vastly different propositions that should not be conflated.") (emphasis in original))); M.H. v.

1   Kijakazi, No. 1:21-CV-01797-CNS, 2023 WL 2401063, at *6 (D. Colo. Mar. 8, 2023) (noting

2   that while true that "statements that the claimant is able or not able to work—determinations

3   which are reserved to the Commissioner—are 'inherently neither valuable nor persuasive,' and

4   the ALJ is not required to 'provide any analysis about how [the ALJ] considered such evidence

5   in [his] determination or decision[,]' . . . [also stating] the Commissioner has supplied no law or

6   argument in support of the contention that statements about functional limitations are equally

7   valueless simply because they are contained in the same document as an opinion about the final

8   issue." (quoting L.A.M. v. Kijakazi, No. 21-CV-00983-NYW, 2022 WL 3139031, at *13 (D.

9   Colo. Aug. 4, 2022))).

10        The M.H. court concluded on one hand that "[m]edical opinions are inherently valueless

11   and unpersuasive in virtue of addressing an issue reserved to the Commissioner when they opine

12   exclusively about the claimant's ability to return to work and 'fail to address what [the claimant]

13   could still do despite [her] impairments and fail ... to describe work-related limitation.' " M.H.,

14   2023 WL 2401063, at *7 (quoting Foy v. Kijakazi, No. CIV 20-1114 KBM, 2022 WL 1288474

15   at *14 (D.N.M. Apr. 29, 2022)).  Conversely, "[b]ased on the relevant law, the Court conclude[d]

16   that the ALJ was required to articulate the persuasiveness of Dr. Kuprian's opinion as it related to

17   M.H.'s physical abilities, but not as it related to the final issue of M.H.'s ability to return to

18   work."  Id.  The court concluded the record was a "medical opinion" because it contained

19   express functional work limitations.  Id. at *6 (where the record stated "symptoms of chronic

20   pain, limitation of motion and flexion, loss of functional use of her neck, ... chronic and often

21   debilitating headaches, inability to focus or concentrate, inability to remain sedentary or viewing

22   [sic] a computer monitor," the court concluded the "opinion identifies M.H.'s impairments

23   (cervical disc disease and the associated symptoms) and explicitly describes the limitations of

24   those impairments as they relate to her ability to perform work-related activities (i.e., remaining

25   sedentary for long periods of time and viewing a computer screen).").

26        The Court agrees with the above courts that simply because a record contains a statement

27   reserved for the Commissioner, does not necessarily mean the entire record does not contain a

28   "medical opinion."  See id.; Machelle H. v. Kijakazi, No. 1:20-CV-00357-CWD, 2021 WL

4342313, at *9-10 (D. Idaho Sept. 22, 2021) ("Here, Dr. Bates' conclusions concerning whether Petitioner is disabled under PERSI does not assess any specific work-related function and, thus, do not constitute a "medical opinion" under 20 C.F.R. § 404.1513(a)(2) . . . [h]owever, the ALJ erred by failing to address Dr. Bates' finding that Petitioner needs 'to change positions frequently from sit and stand and [has] prominent limitations in her general mobility and transitions[,]' [as] [t]his finding by Dr. Bates is a medical opinion about Petitioner's ability to perform the physical demands of work activities that the ALJ was required to address."); Rivera v. Saul, No. 5:19-CV-390-D, 2020 WL 4723170, at *5 (E.D.N.C. June 25, 2020) ("The only part of the opinions that may consist of a conclusion on an issue reserved to the Commissioner is Dr. Parsley's statement that Claimant has 'total occupational and social impairment[,]' . . . [h]owever, even if that statement were inherently neither valuable nor persuasive, it is not the entirety of Dr. Parsley's opinion [and] [t]he ALJ was still required to 'articulate in [her] determination or decision how persuasive [she] find[s] all of the medical opinions.' " (quoting 20 C.F.R. § 404.1520c(b))); Dirani v. Comm'r of Soc. Sec. Admin., No. CV-20-02304-PHX-DLR, 2022 WL 901375, at *2 (D. Ariz. Mar. 28, 2022) ("The Commissioner argues that the ALJ did not need to consider Dr. Worden's opinion because her statement that Plaintiff was 'unable to work' is a conclusion specifically reserved to the ALJ [and] [while] true, [] it ignores that Dr. Worden provided other medical opinions about Plaintiff, including that she is 'unable to sit stand or walk for even 2–4 hours daily.' "); Robbie G. v. Kijakazi, No. 4:20-CV-05230-MKD, 2022 WL 1843980, at *5 (E.D. Wash. Mar. 7, 2022) ("The new regulations dictate that statements such as Plaintiff is not able to work are statements are 'inherently neither valuable nor persuasive' . . . [h]owever, as Plaintiff points out, Dr. Cancado provided numerous specific findings, not just 'sweeping conclusions the claimant is unable to work,' . . . and the ALJ is required to articulate his consideration of Dr. Cancado's medical opinions under the new regulations . . . [nonetheless] [a]ny error by the ALJ in applying the old rules is harmless, however, as the ALJ went on to discuss Dr. Cancado's opinions under the factors of supportability and consistency as required by the new regulations.").

Based on the the above regulatory changes, and relevant caselaw above and below, the

Court's review of the records from Dr. Khanna leads to the conclusion they were not a "medical opinion" as now defined under relevant regulations.  Specifically, the Court has reviewed the records, and the portions specifically highlighted in Plaintiff's reply briefing.  (Reply 7-10.) While Plaintiff presents developed arguments concerning whether the ALJ properly considered the longitudinal record supporting Dr. Khanna's conclusions, as shown in Plaintiff's own summary of these records, the records only reflect numerous types of examination findings, related diagnoses, Plaintiff's complaints, and Dr. Khanna's ultimate conclusions as to each visit. (Id.)  As highlighted in the reply by Plaintiffs, the conclusions were: on August 17, 2018, "I currently think she is totally disabled even for the most sedentary work" (AR 375); on November 15, 2018, "I think she still [sic] totally disabled even for sedentary work" (AR 390); on February 14, 2019, "I'm extending her disability until June 15[, 2019]" (AR 394); on May 16, 2019, "I'm going to have to extend her disability till September 30, 2019" (AR 398); on August 15, 2019, "I'm going to continue to keep her off work as a [sic] do not think she can do even sedentary work" (AR 606); and on February 13, 2020, "I'm going to extend her [d]isability to June 1 of this year" (AR 899).

The Court finds the ALJ's statement regarding Dr. Khanna's records relating to temporary disability findings, and the arguments presented by Plaintiff here (Reply 7-10), to be similar to those expressed by the plaintiff in Wilkins:

> Petitioner highlights the ALJ's statement that "in the absence of a function-by-function analysis of the claimant's limitations, the opinion that the claimant is temporarily totally disabled or unable to return to work is of no probative value and worthy of little weight." Id. at 6 (quoting AR 25). Petitioner notes that there are 244 pages of medical records from Dr. Haider in the record, covering nearly a decade of treatment (including the entire period from Petitioner's amended alleged onset date of November 20, 2009 through her date last insured of December 31, 2009). Petitioner suggests that "[t]he Court can literally pull up any of Dr. Haider's reports and see the results of his examination at any given visit throughout the relevant period." Id. at 7. Petitioner then quotes a portion labeled "Objective Findings" in one of Dr. Haider's records, that discusses tenderness in various regions, restriction of motion, pain, and other symptoms. Id. (quoting AR 369). Petitioner then argues that "[t]he medical records obtained from Dr. Haider do contain a function by function analysis of the claimant's limitations contrary to the opinion of the ALJ." Id.

The Court is not persuaded that the record Petitioner quoted, dated January 14, 2010, contains a "function-by-function analysis of the claimant's limitations." The record does include the objective findings Petitioner indicated. But those objective findings are only tangentially related to any analysis of function. They disclose that "motion is restricted" and that "straight leg raising is negative" both to the left and to the right "in a sitting as well as supine position." (AR 369.) But such objective findings describe the clinician's raw physical and diagnostic observations without anchoring such observations to any broader assessment of functioning. Moreover, nothing in the quoted record directly addresses any limitations Dr. Haider perceived. The same record indicates that Petitioner "has been instructed to ... remain off-work [for] 6 weeks," but it does not discuss any particular functional limitations that necessitated such an instruction. (AR 370.) Furthermore, the ALJ stated that "the clinical and objective findings within the record, including those of Dr. Haider, are consistent with the conclusion that the claimant could do work within the limitations noted herein." (AR 25.) Petitioner understandably disagrees, but she does not directly refute this statement by the ALJ. She identifies no evidence indicating that Dr. Haider's records support more significant limitations.

Wilkins v. Berryhill, No. 2:17-CV-00328-REB, 2018 WL 4604014, at *7 (D. Idaho Sept. 25, 2018).

While there is reference to the word sedentary, notably absent are specific opinions concerning what Plaintiff is capable of doing, and specific functional limitations. The Court concludes that Plaintiff has not demonstrated that the records constitute any medical opinion under the new regulations. See Rokko M., No. 2:22-CV-29-DWC, 2022 WL 4482625, at *2–3 (W.D. Wash. Sept. 27, 2022) ("Dr. Hirdes's summary consists mostly of Plaintiff's results from psychological assessments and Dr. Hirdes's impressions of her impairments . . . [w]hile Dr. Hirdes did provide some comments about Plaintiff's employability, the comments were limited and lacked any functional limitations that speak to Plaintiff's ability to perform work activities despite her . . . besides these general statements, ALJ provided no details about her functional limitations, such as how Plaintiff can meet "mental demands of work activities.' " (citing 20 C.F.R. § 404.1513(a)(2)(ii)); see also id., at *3 ("Dr. Hirdes also stated that 'pronounced levels of accommodations' would allow Plaintiff to work, that '[s]he should work not more than on a part[]-time basis,' and recommended that she consider applying for Social Security benefits . . . [b]ut statements regarding how a claimant is or is not 'disabled, blind, able to work, or able to

1  perform regular or continuing work' are statements on issues reserved to the Commissioner, not

2  medical opinions." (citing 20 C.F.R. § 416.920b(c)(3)(i))).  While Dr. Khanna at various points

3  found Plaintiff to be temporarily disabled and could not even perform the most sedentary of

4  work, the Court finds such statements do not rise to the level of containing "statements about

5  Plaintiff's ability to perform physical, mental, and other demands of work activities with

6  [sufficient] *specificity*":

> Upon review, the undersigned finds Dr. Wade's psychological
> evaluation note constitutes "other medical evidence" because it
> describes "judgments about the nature and severity of [Plaintiff's]
> impairments, [her] medical history, clinical findings, diagnosis,
> treatment prescribed with response, [and] prognosis." 20 C.F.R. §
> 404.1513(a)(3) . . .
>
> . . . Indeed, Dr. Wade's findings: (1) memorialize Plaintiff's
> subjective complaints; (2) record her results on diagnostic
> examinations and tests; (3) reflect Dr. Wade's "Treatment
> Implications[;]" (4) detail a diagnosis; (5) record Plaintiff's mental
> status; (6) set forth clinical findings; (7) prescribe treatment; and
> (8) include judgments about the nature and severity of Plaintiff's
> impairments, such as Plaintiff's depression and memory deficits.
> (R. at 342-43.) Further, the evaluation note omits any statements
> about Plaintiff's ability to perform physical, mental, and other
> demands of work activities with specificity that would allow the
> ALJ insight into the extent to which Plaintiff's mental impairments
> hinder her ability to perform these activities. *See id.* §
> 404.1513(a)(2)(i)(A)-(D). For example, although Dr. Wade
> remarked that "due to the severity of [Plaintiff]'s depression, she
> should apply for FMLA[,]" this statement fails to provide the ALJ
> with detail about the extent to which Plaintiff can: (1) understand;
> (2) remember; (3) maintain concentration, persistence, or pace; (4)
> carry out instructions; or (5) respond appropriately to supervision
> or work pressures in a work setting. (R. at 343) *See* 20 C.F.R. §
> 404.1513(a)(2)(ii).
>
> Accordingly, the ALJ was not required to articulate how
> persuasive she found Dr. Wade's evaluation note because it
> constituted "other medical evidence." *See id.* § 404.1513(a)(3).

23  Angela W. v. Kijakazi, No. 3:21-CV-00550 (MRC), 2022 WL 17585786, at *6–7 (E.D. Va. Dec.

24  12, 2022) (emphasis added); see also id. at *8 ("Like Dr. Wade's evaluation note, Dr. Khawaja's

25  neuropsychological evaluation note fails to indicate what Plaintiff could still do despite her

26  impairments or what specific limitations her impairments caused . . . [h]owever, Dr. Khawaja

27  declined to specify the functional limitations resulting from Plaintiff's impairments that impact

28  her ability to perform physical, mental, or other demands of work activities."); Lenord D. v.

1   Kijakazi, No. 2:21-CV-00246-LRS, 2022 WL 2070883, at *5 (E.D. Wash. June 8, 2022) (finding

2   a statement that "Patient's work forms filled out today be off work until vertigo resolves," was

3   "[a] finding that Plaintiff is disabled or unable to work" and "an issue reserved for the

4   Commissioner . . . considered neither valuable nor persuasive and does not need to be discussed

5   in the ALJ decision." (citing 20 C.F.R. §§ 404.1520b(c), 416.920b(c)); Butch S. v. Kijakazi, No.

6   421CV00405BLWDKG, 2023 WL 2168469, at *11 (D. Idaho Feb. 6, 2023) ("The ALJ properly

7   found Butler's letter not persuasive because it opinioned only on the ultimate issue reserved to

8   the Commissioner . . . Butler's letter offered no opinion concerning Plaintiff's functional

9   limitations [and] [t]herefore, it was not a 'medical opinion' that the ALJ was required to evaluate

10  under the revised regulations[,] [r]ather, the letter concerned Plaintiff's ability to procure and

11  maintain employment, which was neither valuable nor persuasive to the disability determination

12  [and] [t]he same is true as to the second questionnaire form containing Butler's opinion that

13  Plaintiff met two of the listings."); Kava v. Kijakazi, No. CV 20-00385 ACK-WRP, 2021 WL

14  4267505, at *11 (D. Haw. Sept. 20, 2021) ("Because the information the ALJ cited from Dr.

15  Lawler on the issue of Kava's cognitive issues does not address what Kava is still able to do or

16  whether he has restrictions in work activities, the ALJ was not required to treat Dr. Lawler's

17  findings as medical opinions under 20 C.F.R. § 404.1513(a)(2)."); Ferreira v. Saul, No. CV 19-

18  00241 JAO-KJM, 2020 WL 1318789, at *9 (D. Haw. Mar. 20, 2020) ("Because the notes of Ms.

19  Gino referenced by Plaintiff, as contained in Exhibit 24F, comprise a series of therapy notes, and

20  not an opinion, the framework for weighting opinions is inapplicable."); Darren Jeffrey C. v.

21  Kijakazi, No. 3:21-CV-01012-AHG, 2022 WL 4474261, at *20 (S.D. Cal. Sept. 26, 2022)

22  ("Because Dr. Zink did not prepare his psychological evaluation in connection with Plaintiff's

23  disability claim, his assessment does not address those particular categories of functioning in the

24  language that would be used on a standard Mental Residual Functional Capacity Assessment

25  form . . . [b]ased on these regulations, the Court agrees with Defendant that the ALJ was not

26  required to treat Dr. Zink's psychological evaluation as a 'medical opinion.' "); Wilkins, 2018

27  WL 4604014, at *8 ("Petitioner's argument conflates medical opinions with other types of

28  medical evidence . . . [n]othing in the evidence Petitioner identifies addresses Dr. Haider's

1  opinions or judgments about her limitations or restrictions.").

2      Accordingly, the Court finds the ALJ was not required to evaluate Dr. Khanna's

3  treatment notes as a "medical opinion" under the relevant regulations.  Id.; see also 20 C.F.R. §

4  404.1513(a)(2)(i)-(iv); 20 C.F.R. § 404.1513(a)(3); 20 C.F.R. § 404.1520b(c)(3)(i); see also 20

5  C.F.R. § 416.920b(c); Susan F. v. Kijakazi, No. 20-CV-2201-BAS-DEB, 2022 WL 1694460, at

6  *4 (S.D. Cal. May 26, 2022) ("Dr. Maxon opined Plaintiff was unable to work full time without

7  addressing her functional limitations[,] [t]he ALJ, therefore, properly discounted Dr. Maxon's

8  opinions as addressing an issue reserved to the Commissioner . . . properly found Dr. Maxon's

9  opinion that Plaintiff cannot work full-time unpersuasive . . . [n]one of Dr. Maxon's opinions

10 regarding Plaintiff's inability to work assess her exertional limitations [and] [s]he does not

11 explain why or how Plaintiff's bacterial infection (which diagnosis predates the onset of

12 Plaintiff's disability), or any other impairments prevent Plaintiff from working full time.").

13     However, even if Dr. Khanna's records constituted a "medical opinion" under the

14 relevant regulations, the Court finds the ALJ adequately addressed the factors of supportability

15 and consistency.  (AR 24.)  First, given the above regulations and caselaw concerning issues

16 reserved to determination by the Commissioner, 20 C.F.R. § 404.1520b(c)(3)(i); 20 C.F.R. §

17 416.920b(c), and based on the Court's review of the relevant records emphasized in reply

18 briefing, the Court finds the ALJ's statement that the "comments regarding temporary disability

19 are conclusory, without adequate explanation or support from the relevant objective medical

20 evidence" (AR 24), to be supported by substantial evidence.  See Thomas, 278 F.3d at 957 ("The

21 ALJ need not accept the opinion of any physician, including a treating physician, if that opinion

22 is brief, conclusory, and inadequately supported by clinical findings.").

23     Further, the Court finds the ALJ's statement that the "opinion is inconsistent with the

24 objective evidence from other medical sources and nonmedical sources" (AR 24), to be

25 supported by substantial evidence.  While the Plaintiff's argument has some merit, that on the

26 face, the inconsistency finding is not connected with direct citation to other evidence, the ALJ

27 did in fact note Dr. Khanna's findings in relation to others at various points in the opinion, for

28 example the ALJ compared various notes from Dr. Khanna regarding balance and walking, with

1 | other records:

> Despite the claimant's reported difficulty with balance, her testimony that she uses a walker and wheelchair is not consistent with the evidence. On March 29, 2018, and May 7, 2018, her gait was normal with short distances (Exhibit 8F, pages 5-15). On July 26, 2018, Dr. Ma noted that the claimant's gait was wide based (Exhibit 7F, page 61). On November 15, 2018, Dr. Khanna noted that "she uses a cane now and does so intermittently for longer walks" (Exhibit 5F, page 22). Ten days later, on November 25, 2019, the claimant ambulated normally, and moved all extremities without limitation (Exhibit 11F, page 7). The following day, on November 26, 2018, gait was mildly wide-based with stability (Exhibit 7F, page 52). On December 3, 2018, Dr. Remington noted that she had normal gait and was able to heel and toe walk (Exhibit 7F, page 47). On February 13, 2019, gait was slow and antalgic but she could stand on her heels and toes (Exhibit 6F, page 10). On February 14, 2019, Dr. Khanna noted she was using a cane "as needed" (Exhibit 5F, page 28). On November 25, 2019, the claimant ambulated with a non-antalgic unassisted gait (Exhibit 11F, page 7). On January 7, 2020, she ambulated with normal gait without the assistance of an assistive device (Exhibit 11F, page 25). On September 8, 2020, she ambulated with a normal and steady gait (Exhibit 1 F, page 19). This undermines her allegation of significant difficulty walking and balancing.

(AR 23.)   The ALJ also compared records concerning mental impairments from similar time periods:

> The vast majority of treatment notes indicate normal mental status, with infrequent, mild exacerbations. On April 3, 2018, Dr. Ma noted that the claimant reported having had two anxiety attacks, with the most recent one occurring in 2013 (Exhibit 7F, page 68). On May 4, 2018 and August 17, 2018, Dr. Khanna noted poor concentration and memory but the claimant denied depression or anxiety (Exhibit 5F, page 6, 18). A depression screen was negative on September 17, 2018 (Exhibit 7F, page 10). The claimant was alert, cooperative, pleasant and oriented in all spheres, but anxious, on March 13, 2019 (Exhibit 6F, page 6). A depression screen was negative, and she had appropriate affect and demeanor, on March 11, 2019 (Exhibit 10F, page 15). She had appropriate affect and demeanor on September 10, 2019 (Exhibit 10F, page 11).

(AR 18; see also AR 22 (contrasting various exam records).)

Thus, assuming *arguendo* Dr. Khanna's records constitute a medical opinion, the Court concludes the ALJ's analysis of the supportability and consistency factors is based on substantial evidence from the record. Woods, 32 F.4th at 792; Ford, 950 F.3d at 1155; Bray, 554 F.3d at 1228.

///

1

**V.**

2

**CONCLUSION AND ORDER**

3      In conclusion, the Court rejects the Plaintiff's challenges and finds no error warranting

4   remand of this action.   The Court finds the ALJ properly analyzed and considered the state

5   agency physicians' handling limitations, and Dr. Khanna's assessments.

6      Accordingly, IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment

7   is DENIED, Defendant's cross-motion for summary judgment is GRANTED, and Plaintiff's

8   appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER

9   ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security

10   and against Plaintiff Monica Rodin.  The Clerk of the Court is directed to CLOSE this action.

11

IT IS SO ORDERED.

12

13   Dated:   **May 4, 2023**

14                                                                    UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28